**Wallace L. PEELE et al.,
Plaintiffs,**

v.

**Rogers C. B. MORTON, Secretary of Interior of the United States of America, et al., Defendants.**

**No. 75-0002-CIV-2.**

United States District Court,
E. D. North Carolina,
Elizabeth City Division.

June 5, 1975.

Leonard G. Logan, Jr., Manteo, N. C., for plaintiffs.

Thomas P. McNamara, U. S. Atty., by Bruce H. Johnson, Asst. U. S. Atty., Chief, Land & Natural Resources Section, Raleigh, N. C., Dwight H. Wheless, Kellogg, Wheless, White & Reeves, Manteo, N. C., for defendants.

Rufus Edmisten, Atty. Gen. of N. C. by W. A. Raney, Jr., Associate Atty. Gen., Raleigh, N. C., amicus curiae.

## MEMORANDUM OPINION AND ORDER

LARKINS, District Judge:

Plaintiffs are commercial fishermen and residents of the villages on the islands of Chicamacomico, Ocracoke, Bodie, Roanoke and Collington. They ply their trade by hauling seine nets onto the beaches of North Carolina's Outer Banks as their ancestors have done for centuries. In 1958 some seventy-five miles of beaches along the Atlantic coast of Bodie, Hatteras and Ocracoke Islands were acquired by the United States as part of the Cape Hatteras National Seashore. Since that time plaintiffs have continued with their commercial fishing

activities, but they have often been forced to share use of the beaches with increasing numbers of sport fishermen who are attracted by the surf fishing opportunities at Cape Hatteras. Recently there has been some evidence of tension between the local commercial fishermen and these non-resident sport fishermen. On January 28, 1975, the National Park Service adopted regulations restricting commercial fishermen from using seine nets on certain beaches within the National Seashore on week-ends from October through April. This regulation had the stated purpose of attempting to alleviate the tension between commercial and sport fishermen and was to have become effective on February 12, 1975.

On February 14, 1975, plaintiffs filed this action seeking both preliminary and permanent injunctive relief to restrain enforcement of this regulation. They allege that the regulation is beyond the scope of the Secretary of the Interior's regulatory power, is void for vagueness, amounts to a denial of due process and equal protection and is a taking of their property without just compensation. In the interests of public safety, the Honorable F. T. Dupree, Jr., United States District Judge, issued a Temporary Restraining Order temporarily delaying the enforcement of the regulation until the matter of plaintiffs' Motion for Preliminary Injunction could be heard. Although defendants originally acquiesced to the entry of this restraining order, they have subsequently moved the Court to dissolve it.

The matter of plaintiffs' Motion for Preliminary Injunction was heard on April 2, 1975. Following that hearing the federal defendants filed a Motion for Summary Judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure contending that the case involves no genuine issues of material fact and that they are entitled to a judgment as a matter of law. Oral arguments on defendants' Motion for Summary Judgment were heard on April 22, 1975. The remaining matter before the Court is the application of Congressman Walter B. Jones for leave to appear as an *amicus curiae*.

I.

Plaintiffs contend that the regulation in question impairs their right to earn a livelihood from commercial fishing within the boundaries of the Cape Hatteras National Seashore and, therefore, exceeds the limits of the Secretary of the Interior's rule-making powers as conferred on him by 16 U.S.C. §§ 3 and 459 and also that it violates certain of their constitutional rights. On the other hand, defendants argue that the regulation is a lawful exercise of the power delegated to the Secretary by the Congress to regulate commercial activities on National Park Service lands and that it violates none of plaintiffs' constitutional guarantees. In either event, interpretation of the legislation upon which this regulation purportedly is based is clearly a threshold issue which must be decided before the Court can determine whether any further proceedings in this case are necessary.

The statute which defendants cite as authority for adopting the regulation in question is set forth in 16 U.S.C. § 459a–1:

The administration, protection, and development of the aforesaid national seashore recreation area shall be exercised under direction of the Secretary of the Interior by the National Park Service, subject to the provisions of sections 1 and 2 to 4 of this title * * * Provided further, that the legal residents of villages referred to in section 459 of this title shall have the right to earn a livelihood by fishing within the boundaries to be designated by the Secretary of the Interior, subject to such rules and regulations as the said secretary may deem necessary in order to protect the area for recreational use as provided for in sections 459 to 459a–3 of this title.

Plaintiffs argue that this statute amounts to a Congressional guarantee that the commercial fishermen of the Outer Banks will always have the unimpeded right to earn a livelihood by fishing in the manner of their forefathers and that "any rule or regulation which impairs that right to earn a livelihood is beyond the power granted to the Secretary of the Interior and is therefore arbitrary, capricious, unreasonable and an abuse of discretion." In short, this approach visualizes the Secretary's regulatory power as being qualified and delimited by the statutory right conferred on the villagers of the Outer Banks. In the instant case, plaintiffs allege that the regulation limiting commercial fishing at Cape Point on the week-ends from October through April, when considered together with other Park Service regulations limiting the areas in which they may ply their trade, so restricts their commercial fishing opportunities that they are no longer able to earn a livelihood in that manner.

On the other hand, defendants argue that the primary purpose for establishing the National Seashore was to set the area aside as a primitive wilderness and, where not inconsistent with that objective, to encourage recreational uses. Considering the provisions of 16 U.S.C. § 459a–1 in the light of these purposes, defendants interpret the statute as conferring on plaintiffs a "privilege" rather than a "right." They contend that the Congress allowed the villagers of the Outer Banks to use the National Seashore for commercial fishing "so long as the Secretary found that the exercise of this privilege did not interfere with the primary and secondary purposes of the Seashore—i. e., preservation of the unique environment and public recreation."

After carefully considering the relevant legislation, it appears that neither plaintiffs' nor defendants' interpretation is entirely accurate. Rather the correct construction of the enabling legislation lies somewhere between these two opposing views.

## II.

It must first be ascertained whether plaintiffs right acts as an implicit qualification on the scope of the Secretary's regulatory power or whether that power delimits the exercise of the right. In substance, plaintiffs contend that 16 U.S.C. § 459a–1 empowers the Secretary to restrict commercial fishing only to the extent that such regulation does not impair their ability to earn a livelihood in that manner. The plain language of the statute does not support this view. The provision establishing the rights of villagers of the Outer Banks is followed by two express provisos setting forth the circumstances under which the exercise of this right may be restricted. Adopting plaintiffs' interpretation would mean adding a further statutory provision by implication, and courts are generally loath to place words in the mouth of the legislature. That Congress did not intend such an implicit qualification on the Secretary's power to regulate is supported by the absence of any definition of "livelihood" or standards by which the Secretary might undertake to determine when plaintiffs' livelihood might be "impaired" by restrictions. On the other hand, the phrase "right to earn a livelihood by fishing" must have some meaning, for it is unlikely that Congress intended to insert meaningless language in the statute.

It is defendants' position that the entire legislative scheme, when read *in pari materia*, appears to negate the idea of allowing any commercial uses within the boundaries of the Seashore and that Congress included this provision to apprise the Secretary that this one commercial use would be permissible unless he found that it conflicted with the goals of preserving the area and encouraging recreational uses. While this view seems largely correct, it still does

not account satisfactorily for the special emphasis which Congress placed on allowing plaintiffs and their fellow villagers of the Outer Banks to continue fishing as their ancestors have done for centuries.

It is significant that the legislation establishing other national seashores contains no provisions comparable to the one at issue. Clearly there must have been some special impetus for the Congress to give recognition to the commercial fishermen of North Carolina's Outer Banks. The explanation is found in the rather extensive administrative record in this case, and it is grounded not on economic but rather on cultural considerations. The methods employed by plaintiffs in their commercial fishing endeavors differ only slightly from the methods employed by their ancestors some two hundred years ago. As was stated by Dr. Thomas Linton at the hearing on preliminary injunction, the plaintiffs represent "a bit of Americana"; in effect, they are a living cultural resource. 16 U.S.C. § 459a–1 instructs the Secretary of the Interior to give due consideration to this cultural resource when employing his regulatory powers either to effectuate the primary purposes of the National Seashore or to accomplish other lawful objectives in connection with the administration of those public lands. This is not to say that plaintiffs' commercial fishing activities must be given paramount consideration nor that the Secretary under proper circumstances may not decide that the overall public interest requires some restrictions on plaintiffs' trade. The statute merely requires the Secretary to take account of plaintiffs' cultural heritage when deciding which regulations are necessary and proper for the administration of the Cape Hatteras National Seashore.

At a minimum the statute directs the Secretary of the Interior to make specific findings as to the impact of proposed regulations on the ability of plaintiffs to continue to ply their trade in the man-

ner of their forefathers and to give such findings due consideration in his final decision. This duty does not detract from the Secretary's discretion ultimately to choose the course of action which he considers most appropriate. It is a duty to consider, and not a duty to exercise his discretion in a particular way. The Secretary certainly has the discretion to adopt regulations reasonably calculated to effectuate his duty to administer these public lands in accordance with the Congressional mandate, but in so doing, he must at least consider the full impact of his proposed course of action on plaintiffs' way of life.

### III.

The administrative record before the Court indicates that the Secretary of the Interior has made a good faith attempt to assess the impact which this regulation alone will have on plaintiffs' economic well-being. See Exhibit Z to the Affidavit of Jimmie L. Dunning. Nevertheless, this statement of findings appears to be incomplete in two respects. First, the Secretary's findings are directed solely at determining the proposed regulation's *economic* impact on the villagers of the Outer Banks. There are no findings relating to the regulation's impact on these villagers' way of life as a cultural resource. This is not to say that the Secretary has not, in fact, considered any such consequences, but he has not memorialized any such findings so that they might be scrutinized by the public or by a reviewing court.

Second, plaintiffs have alleged that certain other National Park Service regulations, not specifically directed toward restricting commercial fishing, nonetheless appear to have the effect of restricting plaintiffs' opportunities to engage in their traditional livelihood along the beaches of the National Seashore. An example would be those regulations preventing vehicular traffic along certain stretches of beach. These other regulations may or may not impair plain-

tiffs' ability to engage in their ancestral trade. But it would seem that the Secretary has erroneously confined his consideration of economic impacts to the effects produced by the proposed regulation alone. He should consider the cumulative impact of all National Park Service regulations when proposing ·rules which, in effect, restrict plaintiffs' ability to engage in their traditional occupation.

It is not the role of this Court to substitute its judgment for that of the Secretary of the Interior in deciding which regulations are necessary to administer the Cape Hatteras National Seashore in accordance with the Congressional mandate. But it is the duty of the Court to ensure that he gives due consideration to all factors which the Congress has directed him to consider in arriving at such decisions. *Yonkers* v. *United States*, 320 U.S. 685, 64 S.Ct. 327, 88 L. Ed. 400 (1943); *Securities & Exchange Commission* v. *Chenery*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1942). In a case such as this the appropriate remedy is to remand the matter to the Secretary of the Interior for more complete findings as contemplated by the statute and set forth herein. Defendants' Motion for Summary Judgment will remain under advisement until the Court has had the opportunity to review the Secretary of the Interior's further findings and conclusions.

### IV.

■ As to plaintiffs' Motion for Preliminary Injunction, this Court notes that the regulation will not become effective again until October 1, 1975. Until that day approaches, plaintiffs are not threatened with imminent and irreparable harm. Moreover, the defects which the Court has presently noted in the Secretary of the Interior's decision making process are entirely procedural and may not necessarily result in the invalidation of the regulation. Plaintiffs have not yet shown this Court a strong likelihood that they will ultimately prevail on the merits although they may be able to do so later when complete findings are presented to the Court for judicial review. Therefore, this Court has decided to deny plaintiffs' Motion for Preliminary Injunction and to dissolve the Temporary Restraining Order now in effect, but without prejudice to plaintiffs' right to reapply for temporary relief upon a later showing of imminent and irreparable harm and of a greater likelihood of prevailing on the merits.

■ As a final matter, this Court notes that the ultimate disposition of this case will rest largely upon the result of the further administrative proceedings directed herein and upon application of the appropriate legal standards to the Secretary of the Interior's findings of fact. Consequently, it would appear that *amici curiae* can render little· further assistance to the Court. The application of Congressman Walter B. Jones for leave to appear as an *amicus curiae* herein should therefore be denied.

Now therefore, in accordance with the foregoing, it is

Ordered, that plaintiffs' Motion for Preliminary Injunction be, and the same is, hereby denied; and

Further ordered, that defendants' Motion to Dissolve the Temporary Restraining Order be, and the same is, hereby allowed; and

Further ordered, that the application of Congressman Walter B. Jones for leave to appear as an *amicus curiae* herein be, and the same is, hereby denied; and

Further ordered, that defendants' Motion for Summary Judgment shall remain under advisement until the further administrative findings directed herein are presented to the Court for review; and

Further ordered, that the cause be, and the same is, hereby remanded to the Secretary of the Interior for such further proceedings, not inconsistent with this opinion, as may be appropriate.