ORGANIZED FISHERMEN OF FLORIDA, Herbert Z. Marvin, Victor H. Markley and Clyde R. Raffield, Plaintiffs,

v.

Cecil D. ANDRUS, Secretary of the United States Department of the Interior, William J. Whalen, Director of the National Park Service, Joseph Brown, Regional Director of the Southeast Regional Office of the National Park Service and Claude McClain, Acting Superintendent of Everglades National Park, United States Department of the Interior, the National Park Service, and Everglades National Park, Defendants.

No. 80–789–Civ–SMA.

United States District Court,
S. D. Florida,
Miami Division.

April 29, 1980.

Atlee W. Wampler, III, U. S. Atty., Miami, Fla., for plaintiffs.

Paul & Thomson, Miami, Fla., for defendants.

ARONOVITZ, District Judge.

### ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

This matter was heard by the Court at an evidentiary hearing upon Plaintiffs' Motion for Preliminary Injunction. The Court has received testimony, affidavits, exhibits and has heard oral agument of counsel for the parties. The Court having reviewed the entire record, including the memoranda and supplemental affidavits submitted by the parties, Plaintiffs' Motion for Preliminary Injunction is DENIED for the reasons which follow.

## FACTUAL BACKGROUND

Plaintiffs [1] are seeking to enjoin enforcement of 36 C.F.R. § 7.45(e)–(h), as amended at 45 Fed.Reg. 10350 (1980), promulgated by the National Park Service of the Department of the Interior. These regulations, which became effective on March 17, 1980, restrict certain fishing practices in Everglades National Park by: (1) imposing bag limits of ten (10) fish of one species and not more than a total of twenty (20) fish of all species; and (2) prohibiting all commercial fishing in Park waters as of December 31, 1985.[2] In addition, Plaintiffs move the Court for an Order requiring Defendants to remove pilings and other obstructions placed at the entries of Little Madeira Bay and Joe Bay, which are among several areas of Florida Bay designated as critical habitat for endangered species, and now closed to all public entry for purposes of establishing crocodile sanctuaries.[3] 36 C.F.R. § 7.45(g)(4), as amended at 45 Fed.Reg. 10350 (1980).

## ISSUES RAISED BY PLAINTIFFS

The issues Plaintiffs raise in support of their Motion are manifold, but can be summarized as follows. First, Plaintiffs assert that the instant regulations are invalid as having been promulgated in contravention of the procedural requirements of the Department of the Interior, the National Environmental Policy Act of 1969, and the Administrative Procedure Act. Secondly, Plaintiffs argue that the instant regulations are constitutionally infirm as violative of the Privileges and Immunities Clause of the Constitution, and the Fifth Amendment guarantees of due process and equal protection. Finally, Plaintiffs maintain that Defendants are estopped to enforce the regulations herein, said regulations being contrary to representations allegedly made by federal officials regarding continued commercial fishing rights in the Park. Enforcement of the instant regulations, Plaintiffs insist, will immediately and effectively preclude commercial fishing in the Park, and the right of Plaintiffs to earn a livelihood therefrom.

## REQUIREMENTS FOR PRELIMINARY INJUNCTION

■ The Court is governed herein by the four prerequisites for preliminary injunctive relief, as set forth in *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974): (1) a substantial likelihood that Plaintiffs will prevail on the merits; (2) a substantial threat that Plaintiffs will suffer irreparable injury if the injunction is not granted; (3) the threatened injury to Plaintiffs outweighs the threatened harm the injunction may do to Defendants; and (4) granting the preliminary injunction will not disserve the public interest.

## MERITS OF PLAINTIFFS' MOTION

■ Plaintiffs have failed to carry their initial burden of demonstrating a substantial likelihood of prevailing on the merits.

1. Plaintiff Organized Fishermen of Florida is a non-profit organization comprised of approximately 1500 members, some 100 of whom fish in Everglades National Park. Plaintiff Herbert Z. Marvin holds a commercial net fishing permit from the Park. Plaintiff Victor H. Markley holds a commercial hook-and-line fishing permit from the Park. Plaintiff Clyde R. Raffield holds a commercial trap fishing permit from the Park.

2. There are no bag limits on crustacean harvest. So too, net fishermen of mullet and pompano are specifically exempted from the bag limits under 36 C.F.R. § 7.45(f)(17), as amended in 45 Fed.Reg. 22023 (1980). In essence, then, commercial trap fishermen such as Plaintiff Clyde R. Raffield and commercial net fisher-

men such as Plaintiff Herbert Z. Marvin are unaffected by these restrictions until the prohibition of all commercial fishing becomes effective after December 31, 1985. Stated otherwise, the only immediate impact of these restrictions is upon the 63 holders of commercial hook-and-line fishing permits from the Park.

3. Other areas of the Park totalling some 90,000 acres have from time to time been closed to fishing, commercial or otherwise, for related purposes. *See, e. g.*, 36 C.F.R. § 7.45(g)(15)–(17) (1979). The areas closed pursuant to the instant regulations constitute only a small portion of northeast Florida Bay (13%), and only 18,000 acres of the total 660,000 estuarine acres of the Park.

To begin with, Plaintiffs have not clearly shown that the decision of the National Park Service not to prepare "a regulatory analysis of the economic consequences of a rule" in connection with promulgation of the instant regulations violated Department of Interior rulemaking procedures.[4] A regulatory analysis is required only if (1) a proposed rule is deemed *"significant"* as defined in 43 C.F.R. § 14.3(c)(5); and (2) the rule will have an annual economic effect of $100 million or more, or (3) the potential economic effect is considered sufficiently major even though less than $100 million. 43 C.F.R. § 14.3(d) (1979). Rules are *"significant"* within the meaning of 43 C.F.R. § 14.3(c)(5) (1979), if they are "likely to have a substantial economic effect on the entire economy or on an individual region, industry or level of government." A "region" is a geographic area ordinarily covering more than one state. 43 C.F.R. § 14.3(d)(3)(ii) (1979). "Economic effects" means changes in the use of resources which, in principle, would affect national income and which can be valued in dollar terms.[5] 43 C.F.R. § 14.3(d)(3)(i) (1979). In light of these guidelines, the Court is not convinced that the regulations herein are *"significant"*, and that preparation of a regulatory analysis was thereby required. On the contrary, the Court cannot conceive that the procedures for the development of "significant" rules were ever intended to apply in the circumstances of the instant case. The impact of the regulations herein is clearly not "regional" in scope, their applicability confined to the Park, and even then involving the closure of only limited portions thereof. *See* note 3 *supra*. With respect to the impact of the regulations on the commercial fishing industry, the annual economic loss is estimated at $1.21 million, representing 0.5% of the total worth of Florida's commercial fishing industry and 1.8% of the value of landings in Collier and Monroe counties alone.

■ Plaintiffs have further not persuaded the Court that Defendants have violated the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332. At issue is the National Park Service's determination that the instant regulations do not amount to "major federal action significantly affecting the quality of the human environment." On the evidence presented, the Court cannot say that Defendants' threshold determination not to file an Environmental Impact Statement was unreasonable. *Save Our Ten Acres v. Kreger*, 472 F.2d 463, 467 (5th Cir. 1973). In this regard, the Court notes that the "Assessment" and subsequent "Review" of fishery management options in Everglades National Park, prepared at the direction of the National Park Service, indicate that considerable attention was given to alternative courses of action and the economic and environmental consequences of each, with a view towards minimizing the impact on the environment.[6] The Court further notes that Plaintiffs' claim of a lack of an interdisciplinary approach in the promulgation of the regulations is at least called into question by testimony concerning consultation between Defendants and the U.S. Fish and Wildlife Service. Among the other agencies on record as having contributed

4. A regulatory analysis contains: (i) a succinct statement of the problem being addressed and objectives of the rule; (ii) a description of the major alternative ways of achieving the objectives that were considered by the bureau; (iii) an analysis of the economic consequences of each of the alternatives; and (iv) a detailed explanation of the reasons for choosing one alternative over the others. 43 C.F.R. § 14.4(d)(2) (1979).

5. Plaintiffs argue that the economic effect of banning commercial fishing on consumers of seafood should have been considered in assessing the significance of such a rule. However,

Department of Interior procedures make clear that for purposes of determining the necessity of a regulatory analysis, "economic effects" does not include measures of consumers' willingness to pay. 43 C.F.R. § 14.3(d)(3)(i) (1979).

6. The Court leaves open the possibility that the environmentally protective objectives of the National Park Service and the procedures followed herein for the implementation thereof may well render the "Assessment" the functional equivalent of an Environmental Impact Statement. *See, e. g., State of Maryland v. Train*, 415 F.Supp. 116, 121–22 (D.Md.1976).

comments on the instant regulations are the National Marine Fisheries Service, the Florida Department of Natural Resources, and the Florida Game and Fresh Water Commission. 45 Fed.Reg. 10351 (1980). Moreover, even if the Court were to find a violation of NEPA, this finding alone would not obviate Plaintiffs' burden of showing that the general requirements for preliminary injunctive relief have been satisfied. *Canal Authority of State of Florida v. Callaway*, 489 F.2d at 577–78.

■ The Court is not inclined to agree with Plaintiffs that the procedures by which the regulations herein were adopted amount to a denial of due process. Assuming without deciding that Plaintiffs have a legitimate claim of entitlement to their commercial fishing permits, the Court finds that Plaintiffs were afforded sufficient notice and opportunity to be heard to satisfy the constitutional requirements of due process.[7] Specifically, the procedural safeguards employed in the instant case included: (1) four public workshops throughout South Florida preceding promulgation of the proposed regulations; (2) four public hearings throughout South Florida following publication of the proposed regulations at 44 Fed.Reg. 53541 (1979); (3) periods of comment on the regulations as proposed and as published in final form at 45 Fed. Reg. 10350 (1980). By their own allegations in the complaint, Plaintiffs admit having participated in these public forums and having contributed comments in connection therewith. Significantly, Defendants solicited this public input in the rulemaking process although not required to do so by the rulemaking provisions of the Administrative Procedure Act, under which matters relating to public property are exempted. 5 U.S.C. § 553(a)(2); *see Wilderness Public Rights Fund v. Kleppe*, 608 F.2d 1250, 1253 (9th Cir. 1979).

■ Plaintiffs' claims that the regulations violate the Privileges and Immunities Clause of the Constitution and deny substantive due process and equal protection under the Fifth Amendment are similarly unconvincing.[8] Whereas the Privileges and Immunities Clause, (Article IV, § 2, cl. 1), places a limitation on the power of the *States*, there is no question that the complete power *Congress* has over public lands under the Property Clause of the Constitution, (Article IV, § 3, cl. 2), necessarily includes the power to regulate and protect the wildlife living there. *Kleppe v. New Mexico*, 426 U.S. 529, 540–41, 96 S.Ct. 2285, 2292–93, 49 L.Ed.2d 34 (1976). Accordingly, Defendants are authorized, under 16 U.S.C. § 3, to make rules and regulations for the Park deemed necessary or proper to provide greater resource protection through regulated use, and increased recreational use and enjoyment of park resources by resolving the competition between commercial and recreational fishermen.[9] Plaintiffs have not clearly demonstrated that the instant regulations are neither rationally nor substantially related to the accomplishment of the foregoing objectives. To be sure, there is ample evidence in the record from which Defendants could reasonably conclude that regulation of park resources among competing user groups was both necessary and appropriate. Moreover, the evidence is undisputed that the sanctuary areas will eliminate entirely potential croco-

---

7. Having decided initially that the regulations herein were not "significant", the Court would find, at least preliminarily, that from the evidence adduced the rulemaking procedures for the development of non-significant rules were substantially followed. 43 C.F.R. § 14.5 (1979).

8. Plaintiffs' challenge to the imposition of bag limits as unconstitutionally vague as applied to net fishermen is rendered moot by the amendment of the bag limit regulation to exclude net

fishermen of mullet and pompano. *See* note 2 *supra*.

9. Such authority over the use and management over national parks has been held to include the power to prohibit entirely activities inconsistent with the purposes for which the National Parks system was established. *See, e. g., United States v. Brown*, 552 F.2d 817, 822–23 (8th Cir.), *cert. denied*, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977).

dile encounters with net fishermen and prevent disruption of crocodile nesting areas by boat traffic.[10] *See, e. g., Eiseman v. Andrus,* 433 F.Supp. 1103 (D.Arizona 1977), aff'd sub nom., *Wilderness Public Rights Fund v. Kleppe,* 608 F.2d 1250 (9th Cir. 1979). Furthermore, inasmuch as the bag limits are imposed upon *all* hook-and-line fishermen, and the sanctuary areas closed to *all* public access, Plaintiffs' argument that these regulations are discriminatory and impose invidious or arbitrary classifications is not persuasive. *See, e. g., LaBauve v. Louisiana Wildlife and Fisheries Commission,* 444 F.Supp. 1370, 1381–85 (E.D.La. 1978).

■ Contrary to Plaintiffs' contention, the Court finds that Defendants are not estopped to adopt the regulations challenged herein. Where, as in the present case, an agency of the Federal Government acts in a sovereign capacity for the benefit of the public, the United States is not subject to an estoppel which would impede the exercise of its governmental functions. *United States v. State of Florida,* 482 F.2d 205 (5th Cir. 1973); *Accord, Utah Power & Light Company v. United States,* 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917). Nor does the Court conclude that the facts of the instant case presently before the Court warrant departure from controlling precedent in this Circuit.[11]

■ Plaintiffs have also failed to carry their burden of demonstrating a substantial threat of irreparable injury absent injunctive relief. First, the regulation prohibiting all commercial fishing in park waters as of December 31, 1985, quite obviously poses no imminent harm to Plaintiffs. *See, e. g., Peele v. Morton,* 396 F.Supp. 584, 589 (E.D.N.C.1975). Only two of the newly enacted regulations are enforceable immediately: (1) the closure of Little Madeira Bay and Joe Bay; and (2) the bag limit on fish catches, which effectively applies only to commercial hook-and-line fishermen. *See* note 2 *supra.* With respect to enforcement of restrictions on where one may fish and how much fish may be caught, the Court cannot conclude on the basis of the isolated and conclusory affidavits submitted herein that the alleged harm to Plaintiffs is necessarily irreparable.[12] It is apparent, for example, that bag limits imposed within the confines of the Park do not deprive commercial hook-and-line fishermen of the right to pursue gainful commercial fishing activity outside Park waters. It is equally apparent, moreover, that the establishment of crocodile sanctuaries does not impede the right of *all* fishermen to fish the vast unrestricted portions of Park waters. On balance, the Court opines that the threatened injury to Plaintiffs does not outweigh the harm to Defendants and disservice to the public interest that would ensue if enforce-

10. Although Plaintiffs have also attacked the regulations herein as "philosophically" unsound, the Court notes that the Endangered Species Act of 1973, 16 U.S.C. § 1531 et seq., imposes an affirmative duty on Defendants not only to protect but also to increase the population of endangered species, such as the American crocodile. *Defenders of Wildlife v. Andrus,* 428 F.Supp. 167, 169–70 (D.D.C.1977). Plaintiffs' reliance in this regard on the policy underlying the Fishery Conservation and Management Act of 1976, 16 U.S.C. § 1801 et seq., is misplaced. That Act cannot be said to have either expressly or impliedly repealed the high priority accorded the protection of animal life under the Endangered Species Act. *Compare Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978).

11. Thus, there is no evidence that the alleged assurances by federal officials as to continued

commercial fishing in the Park were tantamount to fraudulent misrepresentations, or were ever incorporated into the written agreement or deed between the United States and the State of Florida by which land was ceded for the creation of Everglades National Park. *Compare Peele v. Morton,* 396 F.Supp. 584, 586–89 (E.D.N.C.1975). Parenthetically, the Court notes that over the years and without objection, Defendants have increasingly exercised prescriptive powers in the Park. *See* note 3 *supra.*

12. That Plaintiffs' injuries would result from threatened prosecution under the instant regulations would not, as Plaintiffs suggest, be sufficient to justify a determination of irreparability. *See, e. g., LaBauve v. Louisiana Wildlife and Fisheries Commission,* 444 F.Supp. at 1385.

ment of the National Park Service regulations is enjoined. In balancing the relative hardships threatened to the parties, the Court is guided by the compelling governmental interest in preserving national park resources and enhancing the public use and enjoyment thereof. 16 U.S.C. § 1. In particular, the legislation establishing Everglades National Park provides "The said area or areas shall be permanently reserved as a wilderness, and no development of the project or plan for the entertainment of visitors shall be undertaken which will interfere with the preservation intact of the unique flora and fauna and the essential primitive natural conditions now prevailing in the area." 16 U.S.C. § 410(c). To enjoin preliminarily the enforcement of the instant regulations, thereby permitting the continued unrestricted exploitation of the Park's fishery resources, would undermine the aforestated congressional expression of the public interest which Defendants are by law obligated to promote, and Plaintiffs have failed to convince the Court otherwise.[13]

The above discussion shall constitute the Court's Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a). For the foregoing reasons, it is thereupon

ORDERED AND ADJUDGED that Plaintiffs' Motion for Preliminary Injunction be and the same is hereby DENIED.

---

**13.** The Court reiterates that whatever rights Plaintiffs might arguably possess by virtue of their commercial fishing permits, e. g., *LaBauve v. Louisiana Wildlife and Fisheries Commission*, 444 F.Supp. at 1377-79, such rights are not unfettered or absolute, and the precise extent to which restrictions may be placed thereon remains for consideration at a full hearing on the merits.