**SOUTH FLORIDA GROWERS ASSOCIATION, INC., Limeco, Inc., and J.R. Brooks & Son, Inc., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE, John R. Block, Secretary, and Dr. Harry Mussman, Administrator Animal and Plant Health Inspection Service, Defendants.**

No. 82–2462–Civ–SMA.

United States District Court, S.D. Florida, Miami Division.

Nov. 26, 1982.

Joseph A. Moretz, Joseph L. Rebak, Blackwell, Walker, Gray, Powers, Flick & Hoehl, P.A., Miami, Fla., John M. Himmelberg, Washington, D.C., for plaintiffs.

Stanly Marcus, U.S. Atty. S.D. Fla. by Marc Fagelson, Asst. U.S. Atty., Miami, Fla., for defendants.

## ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

ARONOVITZ, District Judge.

THIS MATTER was heard by the Court at an evidentiary hearing upon Plaintiffs' Motion for a Preliminary Injunction and for an extension of the existing Temporary Restraining Order prohibiting the importation of lemons and limes from Mexico into the United States. The Court has received testimony, affidavits, exhibits, and has heard oral argument of counsel for the parties. The Court, having reviewed the entire record, including the memoranda submitted by the parties,* it is thereupon

ORDERED AND ADJUDGED that Plaintiffs' Motion for Preliminary Injunction is GRANTED, and the Temporary Restraining Order as set forth in this Court's Amended Order dated November 17, 1982, is hereby extended and converted into a preliminary injunction to remain in effect until five (5) days following the date that either an interim rule or a final rule is promulgated by the Secretary of Agriculture in accordance with law and regulations after a due and proper hearing and notice thereof, wherein the ban against importing limes and lemons from Mexico is lifted or modified in whole or in part, for reasons more fully set forth in this Court's Opinion containing Findings of Fact and Conclusions of Law, which follows.

## OPINION

### Factual Background

In late July, 1982, officials of the United States Department of Agriculture (USDA), Plant Protection and Quarantine (PPQ), were informed by representatives of Mexico's Plant Protection Agency, Sanidad Vegetal (S.V.), of the presence of a citrus disease, possibly citrus canker, in the State of Colima, Mexico. The disease as present in Colima infects the twigs and foliage of Mexican limes. Effective July 23, 1982, the USDA imposed an embargo on the importation of all citrus plants and fruits from Mexico into the United States. The Department took this action as an emergency measure pursuant to 7 U.S.C. § 150dd.

On July 28, 1982, a team of PPQ plant pathologists went to Mexico to examine the disease in the field. They collected specimens which were returned to the United States for use in making an accurate diagnosis of the disease. By early August, it became clear that the disease in Colima was some type of citrus canker. On August 11, a delegation from PPQ met with S.V. to establish the design for a 100,000 tree survey in Mexico. This survey was designed to determine whether the disease was present outside of the State of Colima. To date, the presence of citrus canker has been confirmed at two locations outside the State of Colima. S.V. reports that both of these plantings have been destroyed and that surveys indicate no additional presence of the disease. On September 11 through 15, teams consisting of Mexican and U.S. plant

---

* The Court announced its ruling, *ore tenus,* into the record after the evidentiary hearing and same appears in the transcript. This Order reduces same to writing and expands upon it.

pathologists inspected lime growing trees in the States of Nuevo Leon, San Luis Potosi, Tamaulipas, Vera Cruz, Michoacan, Guerrero, Oaxaca, and Yucatan. Other than the two limited outbreaks previously mentioned, no additional evidence of citrus canker was observed.

After consultation with Mexican officials, on September 22, 1982, the USDA modified its embargo to allow oranges, grapefruits, and tangerines from Mexico, but not from Colima, to come into the United States, if they had been treated by a thorough wetting with a solution containing 200 parts per million active chlorine for a period of at least two minutes. Limes continued to be denied entry because Mexico refused to agree to an immediate eradication program and they did not have an acceptable regulatory procedure in place in Colima to prevent a further spread of the disease.

In late October, 1982, the USDA again reviewed the situation with the view toward allowing Persian limes (as opposed to Mexican-type limes) to come into the United States from areas in Mexico other than Colima.[1] It was determined by the USDA that if certain regulatory measures were applied, the importation of Persian limes from areas other than Colima could occur without the danger of spreading the disease to the United States.

Consequently, the USDA decided to further modify its embargo by allowing Persian limes from any area except Colima to come into the United States under certain restrictions. This modification occurred in the form of emergency interim regulations, published pursuant to 7 U.S.C. § 150dd in the Federal Register on November 17, 1982, and effective immediately upon publication. The USDA determined that these regulations were authorized on an emergency basis and that notice and a public hearing did

not have to be held before these regulations went into effect. Although certain nonformal meetings were held prior to the USDA's decision to publish the interim regulations, no formal record was made nor formal presentations or testimony was received at these meetings. An after-the-fact public hearing has been scheduled for December 7, 1982, in San Antonio, Texas, before the modification achieves permanent status as a restriction on importation under the Plant Quarantine Act, 7 U.S.C. §§ 151 et seq.

Plaintiffs have brought this action to prevent these interim regulations from becoming effective before notice and a public hearing have been held.[2] They claim that the Defendants were in error in relying on 7 U.S.C. § 150dd since this provision authorizes the USDA to take certain emergency measures to prevent the dissemination of plant pests by seizing, treating, destroying, etc., any product which it thinks is infected by the pest and, while not requiring a hearing, is an exception to 7 U.S.C. § 159. That section states "[t]hat before the Secretary of Agriculture shall promulgate his determination that the unrestricted importation of any plants, fruits, . . . may result in the entry into the United States . . . of injurious plant diseases . . ., he shall, after due notice, give a public hearing . . . at which any interested parties may appear and be heard. . . ."

### The Law

■ The Fifth Amendment prohibits the government from depriving a person of life, liberty, or property without due process of law. In order to ascertain whether governmental action affecting a person is violative of this prohibition, two inquiries are made: first, a life, liberty, or property interest within the meaning of the clause must be

---

1. It appears that Mexican-type limes are grown primarily in Colima while Persian limes are grown there and in areas of Mexico other than Colima.

2. Subsequent to their initial complaint in which plaintiffs prayed for injunctive relief preventing the implementation of the USDA order until

after notice and a hearing, plaintiffs filed an Application for Preliminary Injunction requesting that the Court order the embargo continued until after a trial or until the disease was eradicated. This request for relief has not been addressed and is beyond the scope of the relief sought in the complaint.

identified; and, second, the degree of process due to the person before he can be deprived of that interest must be ascertained. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

The former inquiry may, of necessity in certain cases, require an examination of the particular property or liberty interests the affected person has. The Supreme Court has made clear "that the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels or money. . . ." *Board of Regents*, 408 U.S. at 571, 92 S.Ct. at 2706. Certain attributes of "property interests" were delineated:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined.
>
> \* \* \* \* \* \*
>
> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.* at 577, 92 S.Ct. at 2709.

The Plaintiffs' rights are defined by their entitlement to preserve their property and protect their livelihoods in accordance with rights vested by statutory law and governmental regulations, at least until the legality or correctness of the USDA's action is determined. The harm and hardship that will occur to Plaintiffs should the citrus which is imported from Mexico be contaminated with citrus canker would be irreparable. In his affidavit, Norman E. Sutton, vice-president of Plaintiff South Florida Growers Association, stated:

> Should the citrus canker in any of its forms become established in our lime groves, this infectious disease will spread very easily and quickly throughout the entire grove area. It also can be expected that this disease will spread to and destroy other citrus fruit groves. Past experience with citrus canker in Florida shows that it can seriously affect all types of citrus fruits.

Sutton Affidavit of November 9, 1982, at ¶ 5. There can be no doubt that the importation of limes and other citrus fruits from Mexico will expose similar crops in the United States to contamination and infection. In such a case, if other means of eradication fail, it may be necessary to treat the disease by burning the groves. There is, therefore, the distinct prospect that Plaintiffs would be totally deprived of all property other than land and be left with nothing, with the attendant loss of jobs for Plaintiffs' employees. This is a $190,000,-000 industry, according to the testimony.

■ Failure to provide adequate protection when property is placed in jeopardy by governmental action can amount to an unconstitutional "taking" of property by destroying it or by exposing it to the risk of destruction. *Wearly v. FTC*, 462 F.Supp. 589, 598 (D.N.J.1978), *vacated on other grounds*, 616 F.2d 662 (3rd Cir.1980); *St. Michael's Convalescent Hospital v. California*, 643 F.2d 1369 (9th Cir.1981). It is this threatening of the Plaintiffs' property right by the governmental action that entitles Plaintiffs to due process.

■ It is apparent to the Court that the Plaintiffs have a substantial property interest involved here in terms of their lime groves and the groves' threatened destruction within the context of rights thereto which are vested by statutory law and governmental regulations. As such, the rights in question should be reviewed to determine the degree of due process to which the Plaintiffs are entitled before they can be deprived of their interests. *Board of Regents v. Roth*, 408 U.S. at 571, 92 S.Ct. at 2706.

■ In determining whether the procedures used by the USDA in promulgating its determination that the embargo should be modified comported with the dictates of the Fifth Amendment, this Court recognizes that the United States Supreme Court has consistently held that a person is entitled to some sort of procedural protection before being deprived of a property interest. *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). This concept of due process is a flexible one. *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Hicks v. Dobbs,* 612 F.2d 577 (5th Cir.1980); *Scherer v. Davis,* 543 F.Supp. 4 (N.D.Fla.1981).

■ The central meaning of procedural due process has been repeatedly made clear: "Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." *Baldwin v. Hale,* 68 U.S. (1 Wall.) 223, 233, 17 L.Ed. 531 (1864); *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). It is equally fundamental that the right to notice and an opportunity to be heard "must be granted at a meaningful time and in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965).

The constitutional right to be heard is a basic aspect of the duty of government to follow a fair process of decisionmaking when it acts to deprive a person of his possessions. The purpose of this requirement is not only to ensure abstract fair play to the individual. Its purpose, more particularly, is to protect his use and possession of property from arbitrary encroachment.

\*　　\*　　\*　　\*　　\*　　\*

For when a person has an opportunity to speak up in his own defense, and when the [government] must listen to what he has to say, substantively unfair and simply mistaken deprivations of property interests can be prevented. It has long been recognized that "fairness can rarely be obtained by secret, one-sided determination of facts decisive rights. . . . [And

n]o better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it." *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 170–172, 71 S.Ct. 624, 647–49, 95 L.Ed. 817 . . . (Frankfurter, J., concurring). If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented.

*Fuentes v. Shevin,* 407 U.S. at 80–81, 92 S.Ct. at 1994–95.

■ In determining what type of due process hearing the Plaintiffs are entitled to receive before the USDA's regulations can take effect, the formula in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), calls for a balancing of the government's interest in allowing fruit importation from Mexico with Plaintiffs' interests in preventing the citrus canker disease from infecting and destroying their groves. Considering the fact that the total embargo of fruit from Mexico went into effect in July, 1982, and that only limited importation was allowed some two months later, there does not appear to be much weight on the balancing scale in favor of the government's interest.

■ Based upon the *Mathews* balancing test and after applying same, the Court finds that the Plaintiffs' interests should be and are entitled to protection. The imminent danger of complete economic disaster warrants these Plaintiffs to be afforded an opportunity to be heard before drastic action is taken in removing the embargo, especially so in light of testimony adduced that a complete embargo afforded the best practicable method of controlling access of the disease into the United States.

### Preliminary Injunction

Having made that initial determination and finding, the Court moves to the question of whether a preliminary injunction should issue. In that regard, we are guided by *Canal Authority of Florida v. Callaway,*

489 F.2d 567, 572 (5th Cir.1974), which sets forth the following prerequisites to a preliminary injunction: (1) a substantial likelihood that plaintiffs will prevail on the merits; (2) a substantial threat that plaintiffs will suffer irreparable injury if the injunction is not granted; (3) the threatened injury to plaintiffs outweighs the threatened harm that injunction may do to the defendants; and (4) granting the preliminary injunction will not disserve the public interest. *See also, Organized Fisherman of Florida v. Andrus,* 488 F.Supp. 1351 (S.D. Fla.1980).

■ First and foremost, the Court is not making a determination on the merits with regard to whether or not there should be an embargo. However, in considering that after notice and a public hearing with full opportunity to Plaintiffs to present their views and opinions, there does appear to be a substantial likelihood that Plaintiffs could prevail in their presentation on the merits. It is uncontroverted that this disease is prevalent in limes in Mexico. There is no contradiction that this disease can spread and that extreme and dire consequences would occur should the disease infect a South Florida grove, thereby affecting a $190,000,000 industry. There was even expert opinion testimony that the disease could spread to other citrus with possibly disastrous results. To prevent the spread of the disease could necessitate the burning and destroying of the infected groves. Under these circumstances, the Court finds that there is adequate support of the first requirement for the issuance of a preliminary injunction.

The second requirement that Plaintiffs will suffer irreparable harm if the disease reaches this area is met without contradiction. There appears to be a risk of significant nature that this disease could affect not only South Florida but the whole Florida citrus industry and, indeed, the citrus industries elsewhere.

Defendants made no allegation that the issuance of a preliminary injunction will cause them any harm. Therefore, the third requirement is met and the Court finds that the threatened injury to Plaintiffs greatly outweighs any harm to the Defendants that an injunction could cause.

All agree that an embargo or quarantine is the most effective means of keeping the disease away from Plaintiffs' groves. Although the Defendants argued that this factor entered into consideration along with the United States' relations with Mexico, nevertheless, the Court finds that the threatened harm to Plaintiffs outweighs any potential public benefit. The Court cannot say that the granting of a preliminary injunction would not serve the public interest—so that a public hearing after due notice can be held.

### The Hearing

The Court is not directing the Secretary to make a determination that is contrary to what has already been found and is not suggesting what should be found. The Court is only requiring that a hearing, with proper notice, and at which testimony is received, be afforded Plaintiffs to be heard, along with other interested parties, in accordance with Plaintiffs' due process rights. The hearing should be with prior notice and of a form that could be reduced to a record that would permit review if necessary. This Court is not determining herein that it or any court would have jurisdiction to review the determination that results from the hearing. This is not a matter for this Court to pass upon at this time. However, there should be a hearing and a record of that hearing so that Plaintiffs can pursue whatever remedies are permitted by law thereafter.

Thereupon, it is

ORDERED AND ADJUDGED that Plaintiffs' Motion for Preliminary Injunction is GRANTED, and the Temporary Restraining Order as set forth in this Court's Amended Order dated November 17, 1982, is hereby extended and converted into a preliminary injunction to remain in effect until five (5) days following the date that either an interim rule or a final rule is promulgated by the Secretary of Agricul-

ture in accordance with law and regulations after a due and proper hearing and notice thereof, wherein the ban against importing limes and lemons from Mexico is lifted or modified in whole or in part.