**ORGANIZED FISHERMEN OF FLORIDA, Herbert Z. Marvin, Victor H. Markley, and Clyde R. Raffield, Plaintiffs,**

v.

**James WATT, Secretary of the U.S. Dept. of the Interior; Russell Dickensen, Director of the National Park Service; Bob Baker, Regional Director of the Southeast Regional Office of the National Park Service; John Morehead, Superintendent of Everglades National Park; The U.S. Department of the Interior; the National Park Service; and Everglades National Park, Defendants,**

and

**Everglades Protection Association, Inc., & World Wide Sportsmen, Inc., Intervenors.**

**No. 80–0789–Civ–SMA.**

United States District Court,
S.D. Florida.

July 6, 1984.

Michael J. Mitchell, Asst. U.S. Atty., Miami, Fla., Jim Mills, Asst. Regional Sol., Atlanta, Ga., for defendants.

E.S. Corlett, III, Gerald E. Rosser, Miami, Fla., for intervenors.

## MEMORANDUM OPINION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' CROSS–MOTION FOR SUMMARY JUDGMENT

ARONOVITZ, District Judge.

### I.—NATURE OF THE ACTION

Plaintiffs seek declaratory and injunctive relief, 28 U.S.C. §§ 2201, 2202, prohibiting defendants from enforcing 36 C.F.R. § 7.45(e)–(h), *as amended* at 45 Fed.Reg. 10350 (1980). These regulations, which became effective on March 17, 1980, restrict certain fishing practices in Everglades National Park by: (1) imposing bag limits of ten fish of one species and not more than a total of twenty fish of all species; (2) prohibiting all commercial fishing in Park waters as of December 31, 1985; and (3) establishing sanctuaries for endangered and threatened species within the Park by closure of certain areas to all public entry.

Heretofore this Court denied Plaintiffs' Motion for Preliminary Injunction after an evidentiary hearing. *Organized Fishermen of Florida, etc. v. Andrus, etc.*, 488 F.Supp. 1351 (S.D.Fla.1980). Many of the same issues addressed at that hearing are readdressed here after the record has been supplemented by a complete Administrative Record of Proceedings ("AR"), additional discovery, and pleadings. This matter is presently before the Court upon cross-motions for summary judgment.[1]

### II.—PLAINTIFFS' ISSUES

Douglas Halsey, Miami, Fla., for plaintiffs.

Although Plaintiffs have stated their issues in more specific terms as hereinafter

---

**1.** Everglades Protection Association, Inc. and World Wide Sportsmen, Inc., recreational sports fishermen were allowed to intervene herein and have essentially adopted the Defendants' posi-

tion. See Intervenors' Memorandum in Response to Motion for Summary Judgment (Doc. No. 130). Intervenors have not filed a separate motion for summary judgment.

noted, essentially Plaintiffs' Amended Complaint charges, in Plaintiffs' words at Plaintiffs' Cross-Motion for Summary Judgment, p. 17:

> "This case is a blatant example of governmental over-reaching. Eager to placate wrongheaded sports fishing interests, Defendants (the "Government") adopted regulations eliminating commercial fishing in the Park knowing full well that such regulations violate their agreement with the State of Florida, that commercial fishing has not been adversely affecting Park resources, and that the Park's own data did not support the conclusion that commercial fishing should be banned..."

### III.—THIS COURT'S PRIOR MEMORANDUM OPINION DENYING INJUNCTIVE RELIEF

This Court's prior Order at 488 F.Supp. 1351 (S.D.Fla.1980), *supra*, set forth many grounds that were advanced by Plaintiffs. The statements of law therein set forth and found by the Court are still applicable with equal force upon the more complete record now before the Court, and thereupon, that prior Memorandum Opinion is hereby ADOPTED and made a part hereof.

After this Court entered its Memorandum Opinion on April 29, 1980, this cause was held in abeyance at the suggestion of the parties until cross-motions for summary judgment could be filed. During the interim Defendant NATIONAL PARK SERVICE held numerous public and private meetings with Plaintiffs and other interested parties.

### IV.—FACTUAL BACKGROUND

The following factual matters advanced by Defendants are supported and uncontradicted in the record:[2]

**2.** At footnote 2 of Plaintiffs' Cross-Motion for Summary Judgment, Plaintiffs concede, for the most part, the correctness of these facts except for objections to certain statements expressing the law, and complain that material facts upon which Plaintiffs claims are based were omitted.

1. In 1934, Congress enacted the law which authorized establishment of the Park at such time that title to sufficient lands in the region of the Everglades had been vested in the United States. 16 U.S.C. § 410.

2. The 1934 Act provided for the administration of the Park in accordance with generic National Park Service ("NPS") authorities, Sections 1 and 2–4 of Title 16, subject to protection of the existing rights of the Seminole Indians. 16 U.S.C. § 410b. Congress further provided that the area be administered as a wilderness, and that the unique flora and fauna and essential primitive natural conditions then prevailing in the area be preserved intact. 16 U.S.C. § 410c.

3. The legislation made no reference to commercial fishing.

4. At the time the Florida legislature considered the legislation to authorize the donation of state lands and funds for the Park, one legislator and several officials of the State government sought clarification of the views and policies of the NPS regarding commercial fishing. (AR–2) The Director of the NPS stated that it was his view that commercial fishing would be permitted to continue after the establishment of the Park. Other similar statements were made subsequently. (AR–2)

5. Following formal establishment of the Park in 1947, the NPS promulgated regulations regarding commercial fishing. (AR–10, pp. 28–29)

6. On February 7, 1978, the Superintendent of the Park received a petition bearing close to 5,000 names, expressing concern over the "diminishing sport fish population" and requesting that the NPS establish bag limits on redfish and trout throughout the Park. (AR–6) In response to the petition and other complaints regarding the condition of the sport fishery in the Park (AR–5), the NPS undertook a study of

The Court has reviewed those material facts as set forth in Plaintiffs' Statement of Material Facts and has supplemented the factual statement herein by reference to some of those uncontradicted facts.

the fishery resource using computerized data acquired during the preceding years from commercial and sport fishermen.

7. The NPS examined various management options designed to reduce pressures on the fishery resources and to allocate those resources among park wildlife, recreational fishermen, and commercial fishermen. The NPS commissioned Centaur Associates, Inc. to study the socio-economic impacts associated with the various management alternatives under consideration. In December 1978, the *Socio-economic Assessment of Fishery Management Options-Final Report* was completed. (AR-8)

8. In January 1979, the Park Service issued the *Assessment of Fishery Management Options in Everglades National Park, Florida* ("Assessment") (AR-10), which contained the results of its own analyses and those provided by the Centaur Report.

9. The NPS held four public workshops in South Florida. The workshops were attended by over 600 people. (AR-30, p. 3) Special interest groups represented included commercial fishermen, sport fishermen, guide fishermen, conservation groups, and boaters. (AR-30, p. 3) Written comments were also received and reviewed. (AR-24) There was consultation with the State of Florida Department of Natural Resources, federal agencies and the American Crocodile Recovery Team. (AR-15, 19, 20, 21, 22, 28, 29)

10. Following analysis of the public comments, the NPS prepared a Review of Fishery Management Alternatives, Everglades National Park ("Review"). (AR-30) The Review summarized the NPS findings on the impacts of the numerous proposed options. The Review identified the preferred alternatives for a proposed rulemaking and the reasons for selecting those alternatives. It also stated that no Environmental Impact Statement ("EIS"), pursuant to Section 102(C) of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4332, was required.

11. The proposed rulemaking was published in the Federal Register on September 14, 1979, 44 Fed.Reg. 53541. The bases for selecting the proposed alternatives were set forth in the Supplementary Information section of the Federal Register notice. The notice requested public comment for 60 days. (AR-31)

12. Public hearings were held in four locations: North Miami, Homestead, Marathon, and Naples, Florida, on October 9–13, 1979. (AR-42-45)

13. In addition, public response was solicited by distribution of an information packet (AR-32) to people who had registered at the workshops, holders of commercial and guide fishing permits, organizations which had commented on the Assessment, and persons attending the public hearings.

14. Additional written comments were exchanged between the NPS and the Fish and Wildlife Service ("FWS"), National Marine Fishery Service ("NMFS"), Florida State Department of Natural Resources, and the American Crocodile Recovery Team. (AR-33, 35, 38, 40, 41, 49, 50, 51, 57, 58)

15. Hundreds of written comments were received from individuals, interest groups, and members of Congress. (AR-52, 53, 54, 55, 56)

16. Consultation pursuant to Section 7 of the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, disclosed the existence of several endangered and threatened species in the Park. (AR-34) The FWS provided its opinion of the impact the proposed regulations would have on the American crocodile. (AR-36, 37) Other endangered or threatened species which the FWS believed might be in the Park were:

| | |
|---|---|
| American alligator | — threatened |
| Arctic peregrine falcon | — endangered |
| Bald eagle | — endangered |
| Brown pelican | — endangered |
| Cape Sable sparrow | — endangered |
| Florida everglade kite | — endangered |
| Florida manatee | — endangered |
| Green turtle | — endangered |
| Hawksbill turtle | — endangered |

| | | |
|---|---|---|
| Kemp's ridley turtle | — | endangered |
| Leatherback turtle | — | endangered |
| Loggerhead turtle | — | threatened |

The FWS requested additional information on these species from the NPS. (AR–34)

17. The NPS supplied the information requested by the FWS (AR–46), and the FWS subsequently provided additional information on the effect of the proposed regulations on the Florida manatee. They found, *inter alia,* that the proposed regulations would have no negative effects on any of the species. (AR–60)

18. Following analysis of the public comments and internal review by the NPS, the final regulations were published in the Federal Register on February 15, 1980, 45 Fed.Reg. 10350. (AR–61)

19. On March 7, 1980, the NPS corrected the omission of section (h), Prohibition of Commercial Fishing, from the final rules, 45 Fed.Reg. 14854. (AR–62)

20. On April 3, 1980, the NPS corrected the omission of an exemption for commercial net fishermen from the bag limits on mullet and pompano, 45 Fed.Reg. 22023. (AR–63)

21. In October 1936, the Florida Legislature's Committee on Lands and Boundaries submitted a report to the Everglades National Park Commission relating to boundaries for the proposed Park. (AR–1) The Boundaries Report included the text of a letter dated July 18, 1936, from Arno Cammerer, the Director of the National Park Service, to Florida Congressman J. Hardin Peterson:

> Whenever the question has been asked, these fishermen [in national parks] have been informed that the National Park Service does not contemplate any injustice to them, nor any curtailment of their legal operations. With [this] as a background, commercial fishermen using the waters surrounding the Everglades may expect equally fair treatment. As a conservation bureau, the National Park Ser-

vice would naturally have to keep an eye on commercial fishery operations and see to it that the supply is conserved. Usually the same laws that are in force outside a national park apply also within, and it would be reasonable to expect that in the administration of this park care would be taken to provide restrictions similar to those in nearby waters *unless the destruction of some variety of fish is definitely threatened.* In other words, since the Everglades park area and especially its coastal water area is so great, I have seen no reason why off-coast commercial fishing may not be continued in the future as it has in the past without injury to park values. [Emphasis added]

22. On January 5, 1939, A.E. Demaray, the Acting Director of the National Park Service, wrote to William Demeritt of the Everglades National Park Committee:

> The National Park Service has stated from time to time that commercial fishing will not be prohibited in the proposed park. ... Please assure the members of the Chamber of Commerce that the National Park Service will not make rules and regulations that will jeopardize the fishing industry of the Florida Keys.

23. Plaintiffs also cite to letters/correspondence and/or committee reports of various federal and state legislative and administrative officials at AR–2, p. 1; AR–1, p. 5; AR–2, pp. 2, 3; AR–2, p. 7; AR–2, pp. 14, 15; AR–10, p. 29; and, others.[3]

## V.—ISSUES

Plaintiffs' claims encompass Constitutional, contractual, administrative, and environmental issues. The Constitutional questions, in large measure, were previously examined by this Court at the injunctive hearing and the ruling thereon. Those rulings remain applicable and are REAFFIRMED.

---

**3.** Paragraphs 21 and 23 above are cited by Plaintiff to support their contention that Everglades National Park was established on the basis of direct and implied repeated assurances by the

United States Government to the State of Florida and its commercial fishermen that commercial fishing within the Park would never be prohibited by the United States.

A. *Are The Challenged Regulations A Proper Exercise Of The Secretary's Authority To Administer The National Parks Or Are They Arbitrary And Capricious*

(a) *Standard of Review*

▮ Judicial review of administrative action should be highly deferential to the agency. *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). The courts should neither substitute their judgment for that of the agency nor rewrite an agency's regulations by reading requirements into statutes which are not clearly there. Furthermore, there is a presumption of administrative regularity. As stated in *Vermont Yankee, supra,* 435 U.S. at 525, 98 S.Ct. at 1202, the Court of Appeals "had seriously misread or misapplied this statutory and decisional law cautioning review courts against engrafting their own notions of proper procedures upon agencies entrusted with substantive functions by Congress." The formulation of agency procedures "was basically to be left within the discretion of the agencies to which Congress had confided the responsibility for substantive judgments." *Id.* at 524, 98 S.Ct. at 1202. The Court concluded that policy matters such as those the Plaintiffs here challenge are to be resolved in other branches of government and are "not subject to reexamination in the federal courts under the guise of judicial review of agency action." 435 U.S. at 558, 98 S.Ct. at 1219. Agency officials are credited with conscientious review of the issues presented to them, *Hercules, Inc. v. EPA,* 598 F.2d 91, 123 (D.C. Cir.1978), and unless the Secretary's action is arbitrary or capricious, it must be upheld.

▮ Also relevant to judicial review here is the well established principle that an agency's interpretation of its own statutes and regulations is entitled to great deference. *Train v. NRDC,* 421 U.S. 60, 75, 95 S.Ct. 1470, 1479, 43 L.Ed.2d 73, (1975); *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965).

Here, of course, we are dealing with the administration of the NPS Organic Act, 16 U.S.C. § 1 *et seq.,* implementation for which the Secretary of the Interior has primary responsibility. In terms of NEPA, we are dealing with an agency's application of the statute to its own program.

The applicable standard was rearticulated in the recent Supreme Court opinion in *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983):

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' ... In reviewing that explanation, we must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' ... Normally, an agency rule would be arbitrary and capricious *if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.*" (Emphasis added.)

*Id.* 103 S.Ct. at 2866–67 [citations omitted].

The relevant questions which should be addressed are:

1. Did the agency rely on factors Congress intended it to consider?

2. Did the agency entirely fail to consider an important aspect of the problem?

3. Does the agency's explanation run counter to the evidence before it?

4. Is the agency's explanation so implausible that it could not be ascribed to

a difference in view or the product of agency expertise?

### (b) *A Proper Exercise of the Secretary's Broad Discretionary Authority*

The task of weighing the competing uses of federal property has been delegated by Congress to the Secretary of the Interior. *Udall v. Washington, Virginia and Maryland Coach Co.,* 398 F.2d 765, 769 (D.C. Cir.), *cert. denied,* 393 U.S. 1017, 89 S.Ct. 622, 21 L.Ed.2d 561 (1968). As such, the Secretary has "broad discretion in determining what actions are best calculated to protect park or public land resources." *Sierra Club v. Andrus,* 487 F.Supp. 443, 448 (D.C.D.C.1980). The balance which he strikes will not be judicially upset unless it is arbitrary or beyond his authority. "Error or unwisdom is not equivalent to abuse." *Udall v. Washington, Virginia and Maryland Coach Co., supra.*

Congress established the National Park Service in 1916. The "fundamental" purpose of the NPS is

"to conserve the scenery and the natural and historic objects and the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."

16 U.S.C. § 1.

Congress empowered the Secretary of the Interior to "make and publish such rules and regulations as he may deem nec-essary or proper for use and management of the parks ... under the jurisdiction of the National Park Service." 16 U.S.C. § 3. And,

"... the authorization of activities shall be construed and the protection, management, and administration of these areas shall be conducted in light of the high public value and integrity of the National Park System *and shall not be exercised in derogation of the values and purposes for which these various areas have been established except as may have been or shall be directly and specifically provided by Congress."* 16 U.S.C. § 1a-1.

(Emphasis added].

Congress authorized the establishment of Everglades National Park in 1934, 16 U.S.C. § 410, and directed that the area or areas ultimately included in the Park be "permanently reserved as a wilderness, and no development ... shall be undertaken which will interfere with the preservation intact of the unique flora and fauna and the essential primitive natural conditions now prevailing in this area." 16 U.S.C. § 410c.

Commercial fishing is not provided for in the enabling legislation for Everglades National Park, nor in any subsequent legislation pertaining to the Park.[4] At no time has Congress directed the Secretary to take any particular actions with regard to commercial fishing within the Park. Commercial fishing like all other activities, has

---

**4.** Where Congress has intended to permit commercial fishing in a national park it has said so explicitly. See, e.g.:

*Cape Hatteras National Seashore* (17 August 1937) 16 U.S.C. Section 459a–1 states: "...that the legal residents of villages (within the seashore) shall have the right to earn a livelihood by fishing within the boundaries (of the seashore), subject to such rules and regulations as the Secretary may deem necessary...."

*Cape Krusenstern National Monument* (2 December 1980) 16 U.S.C. Section 410hh–4 states: "...the Secretary may take no action to restrict unreasonably the exercise of valid commercial fishing rights or privileges obtained pursuant to existing law...."

*Glacier Bay National Preserve—Dry Bay Area* (2 December 1980) 16 U.S.C. Section 410hh–4 states: "...the Secretary may take no action to restrict unreasonably the exercise of valid commercial fishing rights or privileges obtained pursuant to existing law...."

*Jean LaFitte National Historical Park—Barataria Marsh Unit* (10 November 1978) 16 U.S.C. Section 230d states: "Within the Barataria Marsh Unit, the Secretary shall permit hunting, fishing (including commercial fishing) ...."

*Wrangell-Saint Elias National Preserve—Malaspina Glacier Forelands Area* (2 December 1980) 16 U.S.C. Section 410hh–4 states: "...the Secretary may take no action to restrict unreasonably the exercise of valid commercial fishing rights or privileges obtainer pursuant to existing law...."

been subject to the Secretary's broad administrative authority since the Park was established.

Thus, over the years, the NPS has forbidden fishing in certain areas, has limited the type of equipment which could be used, has restricted the number of some types of fish which could be caught, and has forbidden the taking of certain species of fish. (AR–10, pp. 28–29) The regulations challenged herein are a continuation of NPS's efforts to administer the Park in a manner most consistent with the purposes for which it was established.

The regulations at the heart of the dispute herein do the following:

1) Establish sanctuaries for endangered and threatened species within the Park by closure of certain areas to all public entry;

2) Restrict recreational shellfish harvest;

3) Establish limits for fish species; and

4) Eliminate commercial fishing in the Park by December 31, 1985. (AR–61, 62)

As the Administrative Record indicates, the process which culminated in these regulations began after the superintendent of the Park received a petition with close to 5,000 signatures complaining that the sport fish population was being depleted. (AR–6) The NPS undertook a study of the fishery resource using computerized data acquired during the preceding years from commercial and sport fishermen. A. private consulting firm was hired which assembled socio-economic data. Fish populations were studied, catch rates were projected, socio-economic effects were reviewed, public workshops and public hearings were held at which the views of the public, especially those of park users, including commercial fishermen, sport and recreational fishermen, professional guides, environmentalists and conservationists were aired. Reports on endangered species were also received.

While there seemed to be general agreement from all parties that the fish resource had to be protected, there was substantial disagreement on the extent of the problem and its cause. Some blamed the commercial fishermen, some blamed the quality of the water, others attributed the problems to the development of southern Florida, and others stated that it was past NPS management decisions. Still others stated that there was no crisis at all and that placing restrictions on fishing had no connection to any problem. Some felt that there should be an immediate ban on commercial fishing and stricter limits on the recreational catch permitted. Recreational fishermen and guides complained that the quality of their fishing experience had declined and blamed the commercial fishermen. Conservationists expressed concern for endangered species. (AR–42–45, 52–56)

All of the aforegoing information was available to the Secretary, to be considered within the context of his statutory mandate, when he decided to establish the sanctuary areas, phase-out commercial fishing, and to establish the other fishing limitations. The elimination of the harvesting of certain shell fish, the establishment of bag limits and the elimination of commercial fishing, in the Secretary's judgment, encourage the growth of the affected fish populations, thereby restoring the historic age and size distributions of affected species, and enhancing the populations by the number of fish which would have been taken by the commercial fishermen. The ban on commercial fishing will further the goal of preserving the wilderness characteristics for which the Park was established. Bag limits on hook and line fishing will reduce competition between sport and commercial fishermen for spotted sea trout. Likely net encounters involving endangered species such as crocodiles, manatees, and sea turtles will be minimized, if not eliminated, and the elimination of boats from the sanctuary areas will encourage the flourishing of a safe habitat.

■ These steps are hardly arbitrary and capricious. They are consistent with

the purposes for which the Park exists as expressed in the statutes quoted above and are consistent with NPS management policies on fishing.[5] The Secretary could have taken the actions he has taken under the broad management authority delegated to him by Congress. 16 U.S.C. §§ 1, 2–4; 16 U.S.C. § 410 *et seq.* Commercial exploitation of the natural resources is not one of the purposes for which Congress established the Park. The Secretary, as a matter of policy, can implement measures, such as those challenged herein, which in effect, eliminate one predator from the Park and enhance the use of the park by recreational users.

These were not the only steps that could have been taken. Indeed, some may think the Secretary has not gone far enough to restrict fishing activities; others, think he has gone too far. But it is the Secretary to whom Congress has entrusted the authority to make these judgments.

### B. *Plaintiffs Are Not Third-Party Beneficiaries Of An Agreement Between The State of Florida And The Federal Government*

Essentially, Plaintiffs maintain that the ceding of the Park lands by the Florida legislature to the United States created a contract between the State of Florida and the United States which prevents the Defendants from adopting the subject regulations prohibiting commercial fishing. The representations relied upon by Plaintiffs were made by Park Service Officials to United States Senator Holland, United States Congressman Hardin, a State Legislator, and an official of a private fishermen's association. However, the contract, if any, was entered into by Congress when it established the Park by legislation and there is no mention in such legislation of any commercial fishing privileges or rights.[6] Many of the representations were

made after the property was transferred to the United States. Furthermore, this Court is without jurisdiction to grant specific performance of a contract, if any, between the United States and the State of Florida, absent waiver of sovereign immunity. *Larson v. Domestic and Foreign Commerce Corporation,* 337 U.S. 682, 703–04, 69 S.Ct. 1457, 1468–69, 93 L.Ed. 1628 (1949). As stated by the former Fifth Circuit, the test of whether a suit is barred by the doctrine of sovereign immunity in a specific performance context is whether "the effect of the judgment would be to restrain the government from acting or to compel it to act." *Alabama Rural Fire Insurance Company v. Naylor,* 530 F.2d 1221 (5th Cir. 1976). Here, the object of the instant suit, no matter how it is expressed, seeks quite clearly to compel the Defendants in their official capacity to specifically perform a contract.

### C. *No Violation Of Interior Department Rulemaking Procedures*

Plaintiffs contend that the "required" economic consequences analysis was not conducted because the Department mistakenly concluded that the Rule was not "significant". In this Court's earlier Opinion at 488 F.Supp. 1351, 1354, *supra,* this Court stated:

> "[T]he Court cannot conceive that the procedures for the development of 'significant' rules were ever intended to apply in the circumstances of the instant case."

This conclusion is bolstered by the regulatory definition of the term "significant" and the analysis therein contained in said Memorandum Opinion.

Additionally, Plaintiffs lack standing under Count I because there is no private right of action under Executive Order 12044 which was the Order establishing the criteria for rulemaking in this area.

---

**5.** The NPS management policies on fishing are found as AR–4.

**6.** See note 4, supra.

■ In any event, the Secretary complied with all departmental rulemaking policies and procedures in effect at the time the fishing regulations were promulgated.

### D. Plaintiffs Lack Standing To Challenge Defendants' Alleged Non-Compliance with NEPA

■ To have standing in federal court a party must demonstrate both that the challenged act will injure him in fact and that his interest is arguably within the zone of interest to be protected by the statute at issue. *Ass'n of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1972). In the present case plaintiffs have adequately established the first requirement, economic injury-in-fact. However, plaintiffs are simply unable to show that their interests are within the zone of interests protected by NEPA. NEPA was not created to protect purely economic concerns. Rather, plaintiffs must demonstrate "concern for, or connection with, an environmental interest" to have standing under NEPA. *Presidio Bridge Company v. Secretary of State*, 486 F.Supp. 288, 289 (W.D. Tex. 1978), *aff'd* 612 F.2d 578 (5th Cir.), *cert. denied* 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44 (1980); see also *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Since plaintiffs have made no such showing, defendants are entitled to summary judgment on the NEPA claim.

### E. The Regulations are Not Unconstitutionally Vague

Plaintiffs contend that the bag limit aspect of the Regulation, 36 C.F.R. § 7.45(f), is unconstitutionally vague in two respects. First, plaintiffs assert that application of bag limits to commercial net fishermen contradicts other portions of the Regulations, thereby rendering the Regulations unconstitutionally vague. However, on April 3, 1980, some two and one-half years before plaintiffs filed their amended complaint, the Regulations were amended to correct the inadvertent omission of an exception from the bag limits for fishermen holding valid commercial permits for mullet and pompano netting. 45 Fed.Reg. 2202, April 3, 1980. 36 C.F.R. § 7.45(f)(17). Said exception negates any perceived ambiguity in this area.

■ Plaintiffs second contention is that since the Regulations exclude "bait fish" from the bag limits and do not define that term, the Regulations are unconstitutionally vague. The problem with this contention is that 36 C.F.R. § 7.45(f)(6) enumerates those species of fish the Secretary considers "bait." Therefore, the Regulations are not unconstitutionally vague.

### F. The Regulations Do Not Constitute An Unconstitutional Taking of Property

■ At Count VI of their amended complaint plaintiffs contend that by immediately restricting their permits and cancelling the permits after December 31, 1985, the Regulations constitute a taking of property without due process. However, the annual permits are merely a license to conduct commercial fishing activity within the Everglades National Park. The permit is a privilege granted by the Park Service and is, therefore, by its very nature, revocable.

The Ninth and Tenth Circuit Courts of Appeal have concluded that holders of permits allowing grazing on United States property are not entitled to compensation when their grazing rights are terminated. *Pankey Land & Cattle Company v. Hardin*, 427 F.2d 43 (10th Cir. 1970); *Osborne v. United States*, 145 F.2d 892 (9th Cir. 1944). In *Osborne* the court stated:

... No grant of United States property may be made except by virtue of Congressional authorization [citations omitted], and the mere authority given the Forest Service to make appropriate regulations carries with it no authority to alienate for any period of time any phase of government right over the full use of

its lands or to make any agreement regarding them subject to the payment of compensation for its revocation. *Id.* at 896. Moreover, a permit for grazing has been considered "a privilege which is withdrawable at any time for any use by the sovereign without payment of compensation." *Id.* Similarly, plaintiffs in the instant case have no Fifth Amendment taking claim.

Even assuming, however, that plaintiffs have a legitimate claim of entitlement, the constitutional requirements of due process have been satisfied for the reasons stated in the Memorandum Opinion cited above.

Plaintiffs have argued other issues of law which have been carefully reviewed and considered. These issues are hereby found to be without merit.

On the basis of the foregoing, the entry of summary judgment for the defendants and against the plaintiffs is warranted. It is thereupon

ORDERED AND ADJUDGED as follows:

1. Defendants' Motion for Summary Judgment (Doc. No. 107) be, and the same is hereby, GRANTED;

2. Plaintiffs' Cross-Motion for Summary Judgment (Doc. No. 123) be, and the same is hereby, DENIED;

3. Each party shall bear its own costs; and

4. A Final Judgment shall be entered herein reflecting the aforegoing.