775 F.2d 1544
 16 Envtl. L. Rep. 20,053
 ORGANIZED FISHERMEN OF FLORIDA, Herbert Z. Marvin, Victor H.
Markley, and Clyde R. Raffield, Plaintiffs-Appellants,
v.
Donald P. HODEL, Secretary, U.S. Department of the Interior,
Russell Dickensen, Director of the National Park Service,
Bob Baker, Regional Director of the Southeast Regional
Office of the National Park Service, and John Morehead,
Superintendent of Everglades National Park, U.S. Department
of the Interior, the National Park Service, and Everglades
National Park, Defendants-Appellees,
Everglades Protection Association, Inc., & World Wide
Sportsmen, Inc., Intervenors.
 No. 84-5722.
 United States Court of Appeals,
Eleventh Circuit.
 Nov. 15, 1985.
 
 Parker D. Thomson, Thomson, Zeder, Bohrer, Werth, Adorno & Razook, Douglas M. Halsey, Miami, Fla., for plaintiffs-appellants.
 Michael J. Mitchell, Asst. U.S. Atty., Miami, Fla., J. Carol Williams, U.S. Dept. of Justice, Jacques B. Gelin, Washington, D.C., for defendants-appellees.
 Leanne J. Frank, Michael B. Buckley, Gerald E. Rosser, Miami, Fla., for intervenors.
 Appeal from the United States District Court for the Southern District of Florida.
 Before HILL, ANDERSON and GARZA,* Circuit Judges.
 R. LANIER ANDERSON, III, Circuit Judge:
 
 
 1
 Organized Fishermen of Florida and three individuals (collectively referred to as "OFF") filed a complaint in the United States District Court for the Southern District of Florida against the Secretary of the Interior and others ("the Secretary" or "the National Park Service" or "NPS") seeking declaratory and injunctive relief from regulations issued by the Department of the Interior in final form on February 15, 1980 (the "Rules"). 36 C.F.R. Sec. 7.45(e)-(h) (1985). The Rules imposed bag limits on fish caught in the Everglades National Park (the "Park"), established sanctuaries in the Park for endangered species and prohibited all commercial fishing in the Park as of December 31, 1985. OFF's motion for a preliminary injunction to prohibit the enforcement of the Rules was denied. OFF v. Andrus, 488 F.Supp. 1351 (S.D.Fla.1980). OFF and NPS then filed cross-motions for summary judgment. NPS' motion for summary judgment was granted. OFF v. Watt, 590 F.Supp. 805 (S.D.Fla.1984). OFF appeals from this decision. We affirm.
 
 I. BACKGROUND
 
 2
 The background of this case is as follows: In 1934, Congress enacted the law which authorized establishment of the Everglades National Park at such time that title to sufficient lands in the region of the Everglades had been vested in the United States. 16 U.S.C. Sec. 410 (1982). That statute mandated that the proposed park be administered as a wilderness, and that the unique flora and fauna and essential primitive natural conditions then prevailing in the area be preserved intact. 16 U.S.C. Sec. 410c (1982). The legislation made no reference to commercial fishing.
 
 
 3
 During the time the Florida legislature considered donating state lands and funds for the park, several state officials sought clarification of the views and policies of the NPS regarding commercial fishing. The gist of the communications from NPS officials to representatives of the State of Florida was that commercial fishing would be subject to reasonable regulations necessary to perpetuate fish resources but that the NPS did not contemplate prohibiting commercial fishing in the proposed park. See Section II.A., infra, for a full discussion of NPS' representations regarding commercial fishing in the Park.
 
 
 4
 In 1944, Florida conveyed the land for the Park to the United States. The deed contained no reservation of commercial fishing rights. Following the formal establishment of the Park in 1947, Congress added a section to the authorizing statute. The new section of the Act reserved oil, gas and mineral rights but made no mention of commercial fishing in the Park. 16 U.S.C. Sec. 410e (1982). Also, following the Park's establishment, the NPS promulgated rules regulating commercial fishing in the Park. Administrative Record part 10, at 27-29.
 
 
 5
 Some years later, the Park Superintendent began to receive complaints about the "diminishing sport fish population." The NPS also received requests that it establish bag limits on red fish and trout in the Park. The number of complaints peaked in 1978. In response to these complaints and a petition bearing the names of almost 5,000 people, the NPS undertook a study of the matter. The study utilized computerized data acquired during the preceding years from commercial and sport fishermen. A private consulting firm was hired which assembled socioeconomic data. Fish populations were studied, catch rates were projected, and socioeconomic effects were reviewed. Public workshops and public hearings were held at which the views of the public, especially those of park users, were aired. Particularly, the opinions of commercial fishermen, sport and recreational fishermen, professional guides, environmentalists and conservationists were heard. Reports on endangered species were also received.
 
 
 6
 While there seemed to be general agreement that the fish resource needed protection, there was substantial disagreement on the extent of the problem and its cause. Blame for the problem was variously attributed to commercial fishermen, the quality of the water, the development of southern Florida and past NPS management decisions. Some groups advocated an immediate ban on commercial fishing and stricter limits on the recreational catch while some perceived no problem at all and believed, therefore, that restrictions on fishing would be meaningless, if not counterproductive.
 
 
 7
 All of the aforementioned information was available to the Secretary of the Interior for consideration. On September 14, 1979, the proposed rules were published in the Federal Register. 44 Fed.Reg. 53541 (1979). The Rules regulated fishing in the Park by (1) imposing bag limits of ten fish per species and not more than a total of twenty fish of all species, (2) establishing sanctuaries for endangered species and (3) prohibiting all commercial fishing in the Park, effective December 31, 1985 (over six years after the original proposal). Following an analysis of public comments and an internal review by the NPS, the final regulations were approved and published in the Federal Register on February 15, 1980. 45 Fed.Reg. 10350 (1980).
 
 II. DISCUSSION
 
 8
 On appeal, OFF presents three major arguments. First, OFF argues that it is a third-party beneficiary to a contract between Florida and the United States. The Rules, OFF asserts, abridge OFF's vested property right in commercial fishing that OFF holds by virtue of its alleged third-party beneficiary status, and by virtue of a Florida law that allegedly guarantees OFF the right to fish in the Park. Second, OFF claims that even if no enforceable contract exists, the NPS should be estopped from enforcing the Rules because it promised never to prohibit commercial fishing in the Park. Finally, OFF argues that the Rules are arbitrary and capricious and, therefore, invalid under the Administrative Procedure Act.
 
 A. Third-Party Beneficiary Status
 
 9
 OFF argues that it has a vested property right in commercial fishing in the Park as a third-party beneficiary of an alleged contract between the state of Florida and the United States government. Enforcement of the Rules, OFF claims, abridges its property right in violation of Fifth Amendment substantive due process.[1] OFF asserts that the United States agreed never to prohibit commercial fishing in the Park in exchange for the conveyance of Florida land for the Park. This agreement is allegedly evidenced by and based upon NPS' representations concerning commercial fishing in the Park. One such representation was a 1936 letter from the then director of the NPS, Arno Cammerer, to Florida Congressman J. Hardin Peterson. That letter stated in part:
 
 
 10
 Whenever the question has been asked, these fishermen [in national parks] have been informed that the National Park Service does not contemplate any injustice to them, nor any curtailment of their legal operations. With [this] as a background, commercial fishermen using the waters surrounding the Everglades may expect equally fair treatment. As a conservation bureau, the National Park Service would naturally have to keep an eye on commercial fishery operations and see to it that the supply is conserved. Usually the same laws that are in force outside a national park apply also within, and it would be reasonable to expect that in the administration of this park care would be taken to provide restrictions similar to those in nearby waters unless the destruction of some variety of fish is definitely threatened. In other words, since the Everglades park area and especially its coastal water area is so great, I have seen no reason why off-coast commercial fishing may not be continued in the future as it has in the past without injury to park values.
 
 
 11
 OFF also quoted in its appellate brief a letter of A.E. Demaray, acting director of the NPS in 1939, as stating, "The National Park Service has stated from time to time that commercial fishing will not be prohibited in the proposed park.... Please assure the members of the Chamber of Commerce that the National Park Service will not make rules and regulations that will jeopardize the fishing industry of the Florida Keys." Brief of Appellant at 9 n. 12. OFF neglected to point out, however, that the letter also includes a sentence stating: "Just how much [commercial fishing] can be permitted and under what conditions is a question that should be ironed out this winter, at least in its broader aspects."
 
 
 12
 As can be readily seen from these examples, the NPS never purported to abdicate its right and duty to exercise its conservation function.[2] Although OFF's contract and estoppel claims must necessarily rest on NPS representations made prior to Florida's alleged act of reliance (the 1944 conveyance of land for the Park), subsequent communications reaffirm our reading of NPS' intent in the earlier letters and telegrams. For example, a 1947 telegram from the Chicago Director of the NPS stated:
 
 
 13
 At request Regional Director Allen, National Park Service, you are advised long-time National Park Service policy which contemplates fishing in national parks and monuments shall be done in conformity with State laws and regulations subject to reasonable regulations necessary to protect and perpetuate fish resources will apply to Everglades National Park. In keeping with commitment of former Director Cammerer in letter April 28, 1937, to Chester Thompson, Key West, commercial fishing will not be prohibited in the proposed Park.
 
 
 14
 (Emphasis added). In a 1956 letter, Park Superintendent Beard quoted a part of the 1936 letter from Director Cammerer and virtually all of the 1947 telegram discussed above as indications of the NPS position on commercial fishing in the Park. Letter of Daniel B. Beard, Jr., Superintendent, Everglades National Park, to U.S. Senator Spessard L. Holland (Jan. 11, 1956), Administrative Record part 2, at 15. These statements upon which OFF relies simply cannot be fairly read as guarantees that the NPS would never prohibit commercial fishing in the Park.
 
 
 15
 In holding that there was no contract never to prohibit commercial fishing, this court also notes that although there was a reservation of mineral rights in the federal statute authorizing creation of the Park, there was no such reservation of commercial fishing rights in the statute or the deed conveying the Park land to the United States. Where Congress has intended to permit commercial fishing in a national park, it has done so expressly by statute. See, e.g., 16 U.S.C. Sec. 459a-1 (1982) (regarding the Cape Hatteras National Seashore) ("the legal residents of villages [within the Seashore] shall have a right to earn a livelihood by fishing within the boundaries [of the Seashore], subject to such rules and regulations as the ... Secretary may deem necessary...."); 16 U.S.C. Sec. 230d (1982) (regarding the Barataria Marsh Unit of Jean Lafitte National Historical Park) ("Within the Barataria Marsh Unit, the Secretary shall permit hunting, fishing (including commercial fishing)...."); 16 U.S.C. Sec. 410hh-4 (1982) (regarding the Malaspina Glacier Forelands Area of Wrangell-Saint Elias National Preserve, Cape Krusenstern National Monument, and the Dry Bay Area of Glacier Bay National Preserve) ("the Secretary may take no action to restrict unreasonably the exercise of valid commercial fishing rights or privileges obtained pursuant to existing law...."). We find, therefore, that there is no basis in NPS' representations, federal legislation or the deed for the existence of the contract right asserted by OFF. Since there is no such contract, OFF has no vested property right as a third-party beneficiary.
 
 
 16
 OFF's claim rests also in part on a 1929 Florida law, known as the Right to Fish Law. The Right to Fish Law provides in pertinent part that "[n]o water bottoms owned by the state shall ever be sold, transferred, dedicated, or otherwise conveyed without preserving in the people the absolute right to fish thereon, except as otherwise provided in these statutes." 14 Fla.Stat.Ann. Sec. 370.10 (1985 Supp. at 30). OFF claims that this law was implicitly subsumed in the conveyance of the Park land thereby guaranteeing OFF the right to fish commercially.
 
 
 17
 OFF does not contend that the 1929 Florida Right to Fish Law affords it an absolute right to fish commercially without regulation. To the contrary, the law itself expressly permits regulation where provided for by statute. 14 Fla.Stat.Ann. Sec. 370.10(1) (1985 Supp. at 30) ("except as otherwise provided in these statutes"). Assuming arguendo that OFF did so contend, our reading of the statute would not prohibit Florida's exercise of its conservatory, regulatory function. The United States, as Florida's successor in ownership of the Park land, would have the same power to regulate fishing in order to conserve Park resources. Only regulations inconsistent with the conservation function could potentially run afoul of the Florida statute. Therefore, even assuming that the Florida statute was subsumed in the conveyance, the Right to Fish Law does not support OFF's contention that it has a vested property right in commercial fishing in the Park. Since OFF has no property right in commercial fishing in the Park, either by virtue of the Florida statute or by virtue of a contract between Florida and the United States, OFF's substantive due process claim fails.[3]
 
 B. Estoppel
 
 18
 In the alternative, OFF argues that even if no contract existed between Florida and the United States, NPS should be estopped from enforcing the Rules. OFF claims it relied to its detriment upon the representations made by NPS officials prior to the conveyance, and, moreover, that its reliance was reasonable.
 
 
 19
 The remedy of estoppel has its roots in equity. The traditional elements for an estoppel claim, which are designed to balance the equities of a case, are (1) a promise or misrepresentation of fact, (2) reasonable reliance on the misrepresentation or promise, and (3) the reasonableness of such reliance. See Heckler v. Community Health Services, --- U.S. ----, ----, 104 S.Ct. 2218, 2223-24, 81 L.Ed.2d 42, 51-52 (1984). Assuming, but expressly not deciding that estoppel against the government is a viable claim, OFF's argument fails because the representations made by NPS officials were simply not promises of the type upon which all estoppel claims must be based. As noted above, the contemplation of the parties that commercial fishing would not be prohibited in the Park was subject to NPS' retention of its conservation function. Although commercial fishing was deemed consistent with NPS' conservation function for forty years, it is not surprising nor inequitable that the NPS, in exercising its conservation function, might prohibit commercial fishing today. OFF could not reasonably believe that commercial fishing would never run afoul of NPS' reasonable exercise of its conservation function. Assuming OFF relied upon the NPS representations, that reliance was unreasonable. Since OFF fails to establish the traditional requirements for estoppel, this claim will not prohibit the enforcement of the instant regulations.
 
 C. Administrative Procedure Act
 
 20
 Finally, OFF claims that the NPS rules were adopted in violation of the Administrative Procedure Act (the "APA"). 5 U.S.C. Sec. 706(2)(a) (1982). The APA requires a court to set aside agency rules if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." Id. As the district court correctly noted, judicial review of administrative action should be highly deferential to the agency. OFF v. Watt, 590 F.Supp. 805, 811 (S.D. Fla. 1984), citing Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), and Camp v. Pitts, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). Moreover, there is a presumption of administrative regularity. See Vermont Yankee, 435 U.S. at 525, 98 S.Ct. at 1202. The applicable standard of review is stated in Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29, 43-44, 103 S.Ct. 2856, 2866-67, 77 L.Ed.2d 443 (1983):
 
 
 21
 Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.
 
 
 22
 OFF claims that the rules are invalid because they represent a departure from established NPS policy, they distribute a limited resource on an arbitrary and discriminatory basis, and they are not rationally connected to the facts in the record. As previously stated the instant rules are not the first regulation of commercial fishing in the Park. Shortly after the Park was established, the NPS promulgated regulations concerning commercial fishing. Administrative Record part 10, at 28-29. Moreover, the NPS continued to exercise its conservation function up to the time the instant regulations were promulgated.[4] OFF's claim that the rules depart from established NPS policy, therefore, is meritless.
 
 
 23
 OFF also claims that the rules irrationally discriminate against commercial fishermen and that they bear no reasonable relation to the facts on the record. The task of weighing the competing uses of federal property has been delegated by Congress to the Secretary of the Interior. Udall v. Washington, Virginia & Maryland Coach Co., 398 F.2d 765, 769 (D.C.Cir.), cert. denied, 393 U.S. 1017, 89 S.Ct. 622, 21 L.Ed.2d 561 (1968). Consequently, the Secretary has broad discretion in determining how best to protect public land resources. Sierra Club v. Andrus, 487 F.Supp. 443, 448 (D.D.C.1980), aff'd sub nom. Sierra Club v. Watt, 659 F.2d 203 (D.C.Cir.1981). See 16 U.S.C. Sec. 1 (1982). In light of the consideration given to the information gathered from a variety of interest groups and the careful consideration given to the Rules' impact on commercial fishing, it cannot be said that the Secretary abused his discretion in promulgating the Rules. The facts in the record sufficiently support the Secretary's decision. The Rules, therefore, survive OFF's attacks and are not arbitrary and capricious.
 
 
 24
 On the basis of the foregoing, the decision of the district court is
 
 AFFIRMED.[5]
 
 
 *
 Honorable Reynaldo G. Garza, U.S. Circuit Judge for the Fifth Circuit, sitting by designation
 
 
 [1]
 In light of our conclusion that OFF has no property right in commercial fishing in the Park, and although we entertain considerable doubt about the merits of the claim, we need not address the merits of OFF's argument that the Rules constitute a deprivation of OFF's property rights without due process. Neither need we decide whether NPS officials have the authority to abdicate the Service's congressionally prescribed conservation function
 
 
 [2]
 Other representations upon which OFF relies are similarly equivocal. See, e.g., Administrative Record part 1, at 5; Administrative Record part 2, at 1-3, 7, 14-15. Our analysis of these representations, consistent with the examples discussed above, is that they are not promises that commercial fishing would never be prohibited
 
 
 [3]
 We note that the State of Florida, which under OFF's theory was the actual party to the contract under which OFF claims third-party benefits, has been conspicuously silent
 
 
 [4]
 In the years following the establishment of the Park, the NPS has forbidden fishing in certain areas, has limited the types of equipment which could be used, and has forbidden the taking of certain species of fish. Administrative Record part 10, at 28-29
 
 
 [5]
 The district court rejected a number of other claims raised by OFF. OFF v. Watt, 590 F.Supp. 805 (S.D.Fla.1984). These claims are not raised on appeal and are, therefore, abandoned. Fed.R.App.P. 28(a)(4). See Harris v. Plastics Mfg. Co., 617 F.2d 438, 440 (5th Cir.1980)